USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _05/15/2018_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
:
ARS KABIRWALA, LP, :
                           Plaintiff :
    -against- : 1:16-cv-6430-GHW
:
: MEMORANDUM
EL PASO KABIRWALA CAYMAN COMPANY, : OPINION AND ORDER
EL PASO MAURITIUS POWER LTD., :
PENDEKAR KABIRWALA CAYMAN :
COMPANY, and PENDEKAR HOLDINGS :
(KABIRWALA) LIMITED, :
:
                           Defendants. :
:
------------------------------------------------------------------ X

GREGORY H. WOODS, District Judge:

## I.    INTRODUCTION

     Plaintiff, ARS Kabirwala, LP, was one of the original developers of a power plant in Pakistan. In 2001, Plaintiff entered into a contract with one of the owners of the power plant, Defendant Pendekar Kabirwala Cayman Company, and its affiliate, Defendant Pendekar Holdings (Kabirwala) Limited.[1] Pursuant to that agreement, Defendants were obligated to pay 10% of any dividends that they received from the project company during the first fifteen years of the plant's operation, and 25% thereafter. But in the sixteenth year, Defendants continued to pay at the lower rate. They claimed that the terms of an earlier 1996 agreement permitted payments at the lower rate because the dividends were derived from income earned during the first fifteen years of the project's operation, even if they were not distributed until later. Because the terms of the parties' agreement are unambiguous on their face, and Defendants' reliance on extrinsic evidence to create an ambiguity

---

[1] The two other entities named as Defendants in the caption of this case, El Paso Kabirwala Cayman Company and El Paso Mauritius Power Ltd., are the former names of Defendants Pendekar Kabirwala Cayman Company and Defendant Pendekar Holdings (Kabirwala) Limited, respectively.

that does not exist within the four corners of the agreement fails, Plaintiff's motion for summary judgment is GRANTED.

## II. BACKGROUND[2]

Fauji Kabirwala Power Company Limited (the "Power Company") is the owner of an approximately 151 megawatt gas-fired power plant near the town of Kabirwala, Pakistan. The company's principal customer is the Pakistan Water Power Development Authority (the "Power Development Authority"). In March 1996, the Power Company and the Power Development Authority entered into an amended and restated power purchase agreement (the "Power Purchase Agreement"). Pursuant to the terms of that agreement, the Power Development Authority committed to purchase power from the Power Company over a thirty year term, beginning with the commencement of the operations of the power plant being developed by the Power Company.

The parties to this lawsuit, or their predecessors, were among the initial investors in the power project developed by the Power Company. In the Fall of 1996, ARS Kabirwala, LP, the plaintiff here ("Plaintiff"), entered into a Memorandum of Agreement, dated as of October 30, 1996 (the "MOA"), with El Paso Energy International ("El Paso"), and the Fauji Foundation. The MOA's recitals set forth a brief history of the power project's development to that point, and explained that El Paso was replacing a prior equity investor in the power project. As part of the transactions outlined in the MOA, El Paso, or one of its subsidiaries, would acquire a 42.17% interest in the equity of the Power Company, and would agree to provide guarantees and other support for the project's development. The MOA also outlined the consideration that would be paid by El Paso to Plaintiff in exchange for its prior development activities to promote the power project.

---

[2] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and related submissions, and are undisputed or taken in the light most favorable to Defendants, unless otherwise noted.

2

Several months later, as part of the transactions contemplated by the MOA, the Power Company, Plaintiff, El Paso, El Paso Pakistan Power (Private) Ltd. ("El Paso Pakistan"), and several other entities, entered into the Project Payment Agreement, dated December 6, 1996 (the "Original Payment Agreement").  The Original Payment Agreement required Plaintiff to release its interests in the project, and to take a number of steps to effectuate the transfer of shares in the Power Company from a prior equity investor to El Paso's subsidiary, El Paso Pakistan.  Original Payment Agreement § 2.01.  In return, El Paso Pakistan agreed to make a number of payments to Plaintiff, certain of which were contingent on the amount of dividends received by El Paso Pakistan in respect of the shares in the Power Company owned by it.  *Id.* § 2.02(ii) ("El Paso Pakistan shall be obligated to pay . . . from and after the Commercial Operations Date, an amount equal to:  (1) the Base Amount, (2) the Net Proceeds Amount, if any, plus (3) the Additional Amount.").

Five years later, the parties entered into the agreement that is the subject of this dispute—the New Project Payment Agreement, dated April 30, 2001 (the "New Payment Agreement" or the "NPPA").  The agreement is governed by New York law; the parties agree that it is binding and enforceable against them.  The recitals to that agreement describe in part the purposes of the New Payment Agreement, and specify, in particular, that the agreement was entered into in consideration in part for the termination of the payment provisions of the Original Payment Agreement noted above:

> WHEREAS, the parties to the [Original Payment Agreement] have entered into a Termination and Release Agreement . . . terminating in their entirety certain provisions of the [Original Payment Agreement] requiring the payment of the Base Amount, the Net Proceeds Amount, and the Additional Amount; . . .  WHEREAS, in consideration for the execution and delivery of the Termination and Release the parties agreed to execute this Agreement . . . ."

NPPA at 1-2.

The New Payment Agreement required El Paso Kabirwala Cayman Company[3] ("New El Paso") to "pay or cause to be paid to [Plaintiff] from and after the Commercial Operations Date, the following amounts: (1) the Base Amount, (2) the Net Proceeds Amount, if any, plus (3) the Additional Amount." *Id.* § 2.01. It is the obligation to pay the "Base Amount" pursuant to this provision that is the subject of this dispute. Like many commercial agreements, discerning the meaning of this provision requires a deep dive into the defined terms referenced in it, and, in turn, the defined terms embedded in the defined terms. For ease of reference, the relevant defined terms, as set forth in the New Payment Agreement, are laid out in the footnote below.[4]

The New Payment Agreement also specifies when payments pursuant to Section 2.01 are due: "Any payments due hereunder with respect to any Base Amounts . . . shall be payable as promptly as practicable but not later than 15 days after a Base Dividend is *actually received* by the [El Paso subsidiary holding shares in the Power Company]." *Id.* § 2.02 (emphasis added). El Paso Mauritius Power Ltd.[5] ("El Paso Holdings"), another El Paso subsidiary, guaranteed the payment obligations of New El Paso under the New Payment Agreement. *Id.* § 5.12.

---

[3] El Paso Kabirwala Cayman Company later changed its name to Pendekar Kabirwala Cayman Company, the named defendant here.

[4] "'Agreement Year' shall mean a period of twelve (12) consecutive months commencing on each consecutive anniversary of the Commercial Operations Date and ending as of the end of the Day preceding the next anniversary of the Commercial Operations Date, except for the first Agreement Year which shall start on the Commercial Operations Date." Power Purchase Agreement. The parties do not dispute that the Commercial Operations Date referenced in this definition was October 21, 1999.

"'Base Amount' shall mean an amount determined by multiplying the Payment Percentage by the amount of any Base Dividends, and then subtracting any Applicable Taxes." NPPA at 3.

"'Base Dividends' shall mean the amount of any dividends *actually received* by the El Paso Project Subsidiary with respect to the Base Shares in the currency received by the El Paso Project Subsidiary . . . ." *Id.* (emphasis added).

"'Base Shares' shall mean those [ordinary shares of the Power Company] required to be subscribed to and paid for by the El Paso Project Subsidiary . . . , such Shares to represent 42.17% of all [ordinary shares of the Power Company]." *Id.*

"'Payment Percentage' means (i) 10% for the first fifteen Agreement Years, and (ii) 25% commencing at the beginning of the sixteenth Agreement Year and for each year thereafter during which the El Paso Project Subsidiary owns any Base Shares . . . ." *Id.* at 4.

[5] This entity later changed its name to Pendekar Holdings (Kabirwala) Ltd., the named defendant in this action.

The New Payment Agreement contained an express merger clause to underscore that it superseded any prior agreements between the parties with respect to its subject matter. That provision read:

> This Agreement constitutes the entire agreement of the parties with respect to the Project and the transactions contemplated hereby, and supersedes all prior agreements and understanding, whether written or oral, among the parties, including without limitation the Memorandum of Agreement dated October 30, 1996.

New Payment Agreement § 5.07.

As far as is relevant to this litigation, the commercial arrangements between the parties proceeded smoothly for another 14 years. Trouble arrived in the sixteenth "Agreement Year," which, the parties agree, began on December 20, 2014. On June 13, 2015, the Power Company made a dividend payment to New El Paso. Net of taxes, New El Paso received $1,705,774.58. Shortly thereafter, a wire transfer was made to Plaintiff in the amount of $170,577.46—10% of the amount received by New El Paso. This despite the fact that the New Payment Agreement provided that the required payment percentage was "25% commencing at the beginning of the sixteenth Agreement Year." A second dividend was received by New El Paso from the Power Company on or about October 9, 2015. And again, shortly thereafter, 10% of that amount—$166,555.25—was wired to Plaintiff.

This pattern, in which New El Paso paid Plaintiff only 10% of dividends received, continued in the seventeenth Agreement Year. On or about March 15, 2016, the Power Company made a dividend payment to New El Paso in the net amount of $1,659.690.10. On March 28, 2016, 10% of that amount—$165,969.01—was paid to Plaintiff. In the same way, $217,880.22, or 10% of the October 18, 2016 dividend received by New El Paso, was paid to Plaintiff.

Defendants explain that their decision to pay Plaintiff only 10% of the dividends received by New El Paso in the sixteenth and seventeenth Agreement Years was driven by the fact that cash earned in earlier years had been "trapped"—and could not be distributed. In particular, Defendants

assert that the Power Development Authority owed the Power Company millions of dollars for energy produced prior to the beginning of the sixteenth Agreement Year. The Power Development Authority's payments were overdue by two years. As a result, Defendants assert, the dividend payments made by the Power Company in the sixteenth and seventeenth Agreement years represented cash that the Power Company had in fact earned in prior years. Defendants refer to that pool of cash earned in prior years as "trapped cash." Defendants took the position that, because the dividends represented earnings in years prior to the sixteenth Agreement Year, the payment percentage applicable to the years in which the earnings were generated, rather than the year in which the dividends were actually received, should apply.

Plaintiff was not the only investor who disputed Defendants' decision to pay out only 10% of the dividends received by New El Paso. Another investor, Fauji Foundation, also initially asserted that it was entitled to 25% of the dividends made in 2015 and 2016. Unlike Plaintiff, however, Fauji Foundation ultimately agreed that it would accept its payments based on the years in which cash underlying the distributed dividends was earned, rather than the years in which the dividends were received. Plaintiff stood by its position that it was entitled to a full 25% of the dividends received by New El Paso during the sixteenth and seventeenth Agreement Years— approximately $1,081,472 more than they were paid using the 10% rate. Hence, this litigation asking whether the New Payment Agreement required that the rate of payments in the sixteenth and seventeenth Agreement Years be determined based on the year in which the dividend was received, or whether the rate should be determined, instead, based on the year in which the revenue driving the dividend was earned.

### III. PROCEDURAL BACKGROUND

Plaintiff commenced this litigation on August 12, 2016. Dkt. No. 1. On October 27, 2016, Plaintiff amended its complaint, asserting claims for breach of contract, breach of guaranty, unjust

6

enrichment, breach of the covenant of good faith and fair dealing, declaratory relief concerning the amount due under the contract, and also seeking to pierce the corporate veil. Am. Compl., Dkt. No. 33 ¶ 1. On December 22, 2016, Plaintiff voluntarily dismissed its claims against Defendant Pendekar Energy (L) Ltd. Group without prejudice. Dkt. No. 47. And on August 8, 2017, the Court dismissed Plaintiff's claims for equitable relief. Dkt. No. 58. As a result, the only claims surviving at the time of this motion for summary judgment were claims for breach of contract, and a request for entry of declaratory judgment.

## IV. ANALYSIS

### A. Legal Standard

The Plaintiff in this case is entitled to summary judgment on its claim if it can show that "there is no genuine dispute as to any material fact and that [defendant is] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the defendant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted). Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita*, 475 U.S. at 585-86). The issue of fact must be genuine—plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the Court must decide whether a rational juror could find in favor of the non-moving party. *Id.* "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000).

### B. Applicable Law

The New Payment Agreement is governed by New York law. Under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (internal quotation marks omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms." *Id.*; *see South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272, 277 (2005) ("In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." (internal quotation marks omitted)).

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). The question of "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). "It is well settled that a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there

is no reasonable basis for a difference of opinion.  Conversely, . . . the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin Corp.*, 639 F.3d at 69.

"'Ambiguity is determined by looking within the four corners of the document, not to outside sources.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)).  "It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" *W.W.W. Assoc.*, 77 N.Y.2d at 163 (*quoting Intercontinental Planning v Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)).  "An analysis that begins with consideration of extrinsic evidence of what the parties meant, instead of looking first to what they said and reaching extrinsic evidence only when required to do so because of some identified ambiguity, unnecessarily denigrates the contract and unsettles the law."  *Id.*  "[B]efore looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract."  *Id.* at 162.

"Parol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract.  As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement."  *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013).  "Furthermore, where a contract contains a merger clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'"  *Id.* (*quoting Matter of Primex Int'l Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594, 599 (1997)).

### C.  The New Payment Agreement Is Unambiguous

The New Payment Agreement is not ambiguous.  The disputed payment term—the "Base Amount"—is defined simply as "an amount determined by multiplying the Payment Percentage by

9

the amount of any Base Dividends . . . ." NPPA at 3. The "Payment Percentage" establishing the rates at which payments are to be calculated is determined solely by reference to the relevant Agreement Year. NPPA at 4 ("25% commencing at the beginning of the sixteen Agreement Year and for each year thereafter during which the El Paso Project Subsidiary owns any Base Shares"). That term does not suggest that the Payment Percentage is impacted at all by the year in which revenues underlying a dividend were earned—it speaks solely to the relevant Agreement Year, and whether or not New El Paso held shares in the Power Company during that year. There is no dispute that the payments at issue here were made in the sixteenth and seventeenth Agreement Years and that New El Paso owned the shares of the Power Company during those years.

The second defined term used to calculate the "Base Payment" makes it clear that the payments are to be calculated on the basis of the year in which they are received. "Base Dividends" is defined to mean "the amount of any dividends *actually received* by the El Paso Project Subsidiary with respect to the Base Shares in the currency received by the El Paso Project Subsidiary." NPPA at 3 (emphasis added). Reading its composite defined terms together, the term "Base Amount" unambiguously requires the application of a rate mechanically determined solely by reference to the relevant Agreement Year to the "amount of dividends actually received" by New El Paso. The provisions of the New Payment Agreement regarding the required timing of the relevant payment underscores that the agreement requires payments based on the date of receipt of the relevant dividend. NPPA § 2.02 ("Any amounts payable hereunder with respect to any Base Amounts . . . shall be payable as promptly as practicable but not later than 15 days after a Base Dividend is *actually received* . . . ." (emphasis added)). Nothing in the text of the New Payment Agreement supports Defendants' position that the Base Amount should be calculated by reference to the year in which the revenues underlying any dividends were earned. The New Payment Agreement is unambiguous;

New El Paso was required to make payments on the dividends received by it in 2015 and 2016 at a rate of 25%, not 10%.

Defendant's arguments that the New Payment Agreement is ambiguous are insubstantial because they rely on extrinsic evidence. Defendants argue that the agreement is ambiguous because they believe that it is inconsistent with the terms of the MOA that they had entered into in 1996. The commercial expectation of the parties in 1996, they argue, was to pay out a smaller fraction of the revenues earned by the Power Company in the first 15 years of its agreement with Power Development Authority, and then to increase Plaintiff's payments in the agreement's second half. Because the Power Development Authority failed to make payments for two years, those commercial expectations would be thwarted and Plaintiff would receive a windfall were it to be paid at the 25% rate on amounts earned in the first 15 years. These arguments fall short on many fronts.

Principally, the Defendants ignore the basic precept that "'[a]mbiguity is determined by looking within the four corners of the document, not to outside sources.'" *JA Apparel Corp.*, 568 F.3d at 396 (quoting *Kass*, 91 N.Y.2d at 566). Defendants' arguments hinge not on the text of the agreement, but on extrinsic evidence of the parties' negotiation history and asserted commercial expectations. But, as noted above, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *W.W.W. Assoc.*, 77 N.Y.2d at 163.

That the New Payment Agreement contained an express merger clause only emphasizes the weakness of Defendants' reliance on extrinsic evidence to construe the meaning of the contract. The agreement's merger clause expressly referenced the October 30, 1996 Memorandum of Agreement among the group of "all prior agreements and understandings, whether written or oral, among the parties" that the New Payment Agreement expressly superseded. Absent an allegation of fraud (of which there was none here), the presence of the merger clause triggers the parol evidence

rule. *Holloway v. King*, 361 F. Supp. 2d 351, 358 (S.D.N.Y.), *aff'd*, 161 F. App'x 122 (2d Cir. 2005) (*citing Primex Int'l Corp.*, 89 N.Y.2d at 599). Yet Defendants assert that it is the inconsistency between the MOA and the New Payment Agreement that requires a finding that the New Payment Agreement is ambiguous. The merger clause provides still more reason to disregard the extrinsic evidence on which Defendants' arguments so completely depend.[6, 7]

### D. Affirmative Defenses Unavailable

Defendants' two half-hearted, or half-baked, affirmative defenses do not prevent the entry of judgment in favor of Plaintiff. Defendants assert first that the doctrine of mutual mistake bars enforcement of the New Payment Agreement. The specious nature of Defendants' arguments regarding the applicability of the mutual mistake doctrine here is best illustrated by quoting their argument at length:

> ARS-K is not entitled to recover on its breach of contract claim because of the doctrine of mutual mistake. "[M]utual mistake occurs where the parties have reached a real and existing agreement on particular terms and subsequently find themselves bound to a writing which does not accurately express their agreement." *U.S. Russia Inv. Fund v. Neal & Co.*, No. 97-CV-1788, 1998 WL 557606, at *4 (S.D.N.Y. Sept. 2, 1998) (internal quotation marks and citation omitted) (reforming a note to correct a mutual mistake). If ARS-K's interpretation of the NPPA is correct, a mutual and substantial mistake existed at the time the parties entered into the contract because ARS-K and the Defendants agreed to "enter into Project participation agreements" (the PPA and NPPA) "pursuant to which" "ARS-K would be entitled to receive . . . from the income earned for the period commencing with the beginning of the 16th Agreement Year (as defined in the Power Purchase Agreement), 25% of the Base Dividends thereafter declared and paid . . . ." . . . . If the Court determines that the PPA and NPPA mean something different, that is inconsistent with the parties' agreement. As a result, the mutual mistake doctrine precludes summary judgment.

---

[6] The New Payment Agreement's recitals assert that the agreement was entered into in consideration for the termination of the Original Payment Agreement's provision related to the payment of the Base Amount. NPPA at 1-2. While not necessary as part of the Court's analysis, the Court notes that this recital, together with the merger clause itself, severely undercuts the Defendants' argument that the provisions of the 1996 Original Payment Agreement and MOA should guide the Court's evaluation of the New Payment Agreement.

[7] That Fauji Foundation agreed to accept payment on the basis of the year in which the Power Company's revenues were earned is not pertinent. Even more so than Defendants' other proffered extrinsic evidence, a third party's willingness to modify its commercial agreement with Defendants sheds little light on the proper construction of Plaintiff's contract.

Defendant's Opposition, Dkt. No. 76 ("Opp'n") at 11.

Defendants misstate the law of the doctrine of mutual mistake. That fact is best illustrated by a citation at length from the single case that Defendants cite in support of their position.

> Under New York law, a contract may be reformed if there is a mutual mistake of fact or a unilateral mistake of fact by one party and fraud by the other. Also referred to as "scrivener's error," "*[m]utual mistake occurs where the parties have reached a 'real and existing agreement on particular terms' and subsequently find themselves bound to a writing which does not accurately express their agreement.*" Mutual mistake does not occur, however, "where there is a mistake as to the agreement itself on the part of one of the parties." Rather, the mistake must occur simply in reducing the parties' agreement to writing. "[I]n the case of fraud and unilateral mistake, the parties have reached an agreement and, unknown to one party who has been misled by the other, the subsequent writing does not express their agreement." . . . .
> To protect against "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract," there exists a "heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties." Hence, to overcome this presumption, the party seeking to reform the contract "must offer evidence of a 'high order'" that the agreement as written does not reflect the parties' intent. Indeed, that party must "show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties," and "[t]his showing must be 'free of contradiction or equivocation.'"

*U.S. Russia Inv. Fund v. Neal & Co.*, No. 97 CIV. 1788 (DC), 1998 WL 557606, at *4-5 (S.D.N.Y. Sept. 2, 1998) (internal citations omitted) (emphasis added). The only portion of this summary of the doctrine that Defendants point to is italicized above—illustrating how Defendants' argument relies on a selective, incomplete, and, therefore, incorrect construction of the doctrine, which does not apply on this record.

"A claim of mutual mistake is stated where the allegations indicate that the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement. Absent fraud, the mistake shown must be one made by both parties to the agreement, so that the intentions of neither are expressed in it." *Friedland Realty, Inc. v. 416 W, LLC*, 993 N.Y.S.2d 43, 45 (2014) (internal quotations and citations omitted). Under New York law, "[f]or a party to be entitled to reformation of a contract on the ground of mutual mistake, the mutual

13

mistake must be material, i.e., it must involve a fundamental assumption of the contract." *True v. True*, 882 N.Y.S.2d 261, 263 (N.Y. App. Div. 2009). "Proof of the variance between the meeting of the minds and its expression in the writing must be clear." *Surlak v. Surlak*, 466 N.Y.S.2d 461, 476 (N.Y. App. Div. 1983) (citing *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219-20 (1978)); *see also* 22 N.Y. Jur. 2d Contracts § 116 ("The burden of proving mutual mistake is on the party asserting the mistake. To establish the existence of a mutual mistake, the moving party must prove his or her position by clear and convincing evidence.")

Defendants arguments raise exactly the danger warned of in *U.S. Russia Inv. Fund v. Neal & Co.*—having determined that the clearly expressed language of the contract that they agreed to is disadvantageous, they seek reformation on the grounds of a purported mistake. But the evidence that Defendants present in support of the defense is a far cry from the high order of evidence required to overcome the unambiguous language of their written agreement. First, the "mistake" that Defendants point to is far from mutual—they present no evidence that Plaintiff shared their understanding of the New Payment Agreement. This is no mere scrivener's error.

Second, as evidence of the understanding of the parties regarding the meaning of the New Payment Agreement, Defendants point to the text of the 1996 MOA. But as described above, the merger clause of the New Payment Agreement states expressly that it superseded the parties' prior understandings, including the 1996 MOA. In addition, the recitals to the New Payment Agreement indicate that it was entered into to replace the 1996 agreement's provisions related to the payment of the Base Amount.

Defendants fail to meet the standard articulated in the case that they cite in support of their assertion of this defense: They do not "show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties . . . ." *U.S. Russia Inv. Fund*, 1998 WL 557606, at *5 (internal quotations omitted). Nor is their showing "free of contradiction or

14

equivocation." *Id.* Defendants may have chosen to avoid reference to these requirements of the doctrine of mutual mistake in their briefing, but that did not make them go away. The record does not support reformation of the contract on the basis of mutual mistake.

Like the mutual mistake defense, Defendants' invocation of the doctrine of impracticability is not supported on this record. A party is excused from performing on a contract when "performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 261 (1981). The impossibility or impracticability doctrine is construed in a restrictive manner under New York law. *Clarex Ltd. v. Natixis Sec. Americas LLC*, No. 1:12-CV-7908-GHW, 2014 WL 4276481, at *11 (S.D.N.Y. Aug. 29, 2014). "The impossibility of performing the contract may be raised as an affirmative defense in a breach of contract action, but financial difficulty or economic hardship of the promisor, even to the extent of insolvency or bankruptcy, does not establish impossibility sufficient to excuse performance of a contractual obligation." *Urban Archaeology Ltd. v. 207 E. 57th St. LLC,* 951 N.Y.S.2d 84 (N.Y. Sup. Ct. 2009) *aff'd,* 891 N.Y.S.2d 63 (2009). "[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused. . . . In short, the applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts." *407 East 61st St. Garage, Inc. v. Savoy Fifth Ave. Corp.,* 23 N.Y.2d 275, 281-82 (1968).

Wiring 25% of a sum already in hand, rather than 10%, seems not so difficult—and certainly not impossible. As the basis for their impossibility defense, Defendants assert that "the Pakistani government . . . made [New El Paso's] distribution of trapped cash during the 15th Agreement Year impossible." Opp'n at 12. But this argument is misdirection; the question is not what factors may

15

have resulted in the delay of these dividend payments by the Power Company. The question is whether it was impossible for New El Paso to comply with its contractual obligation, namely to pay the Base Amount no later than 15 days after any dividend was actually received. Defendants present no basis to conclude that it was impossible for El Paso Holding to send 25% of the cash that it had received, rather than 10%.

### E. Requested Damages Are Supported by the Record

The undisputed facts on the record support the calculation of damages asserted by Plaintiff, and the entry of judgment against New El Paso. As described above, the each of the distributions made by New El Paso to Plaintiff in 2015 and 2016 were 15% less than the amount due under the contract. The deficiencies are calculated below with respect to each distribution:

> June 2015 Base Dividend
> Dividend Paid to New El Paso: $1,705,774.58
> Amount Received by Plaintiff: $170,577.46
> Date Received by Plaintiff: July 27, 2015
> Amount of Deficiency: $255,866.19
>
> October 2015 Base Dividend
> Dividend Paid to New El Paso: $1,666,552.49
> Amount Received by Plaintiff: $166,555.25
> Date Received by Plaintiff: October 21, 2015
> Amount of Deficiency: $250,082.87
>
> March 2016 Base Dividend
> Dividend Paid to New El Paso: $1,659,690.10
> Amount Received by Plaintiff: $165,969.01
> Date Received by Plaintiff: March 28, 2016
> Amount of Deficiency: $248,953.52
>
> October 2016 Base Dividend
> Dividend Paid to New El Paso: $2,178,802.18
> Amount Received by Plaintiff: $217,880.22
> Date Received by Plaintiff: October 31, 2016
> Amount of Deficiency: $326,820.33

### F. El Paso Holdings Is Liable Under Its Guarantee

El Paso Holdings is liable for the full amount of any obligations not satisfied by New El Paso. El Paso Holdings guaranteed "the performance and payment by New El Paso of all of its obligations under" the New Payment Agreement. NPPA § 5.12. The parties agree that this clear language is enforceable against El Paso Holdings. El Paso Holdings presents no defense to its guarantee obligations other than the absence of a primary obligation. The Court has found that New El Paso's payment was deficient. Therefore, El Paso Holdings is liable for the unsatisfied obligations of New El Paso.

### G. Declaratory Judgment is Unwarranted

Declaratory judgment to order New El Paso to make payments on future dividends at the 25% rate is unwarranted. Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act does not require a court to issue a declaratory judgment. The Act "'confers a discretion on the courts rather than an absolute right upon the litigant.'" *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (citing *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). In order to decide whether to entertain an action for declaratory judgment, a district court is instructed to ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).

Declaratory judgment will not serve a useful purpose at this time. Defendants' explanation for their failure to make payments at the 25% rate during 2015 and 2016 was that the Power Development Authority failed to make payments over the course of two years, which resulted in the accumulation of "trapped cash" during that period. Defendants assert that the trapped cash has

now been distributed in full, and that New El Paso has paid Plaintiff 25% of the dividends that it has received after the trapped cash was distributed. Opp'n at 14. Given that no continuing dispute exists regarding the correct rate for future distributions, the Court declines to enter declaratory judgment for Plaintiff.

## V. CONCLUSION

For the reasons described above, Plaintiff is entitled to judgment against Pendekar Kabirwala Cayman Company and Pendekar Holdings (Kabirwala) Limited jointly and severally in the following amounts: $255,866.19, plus 9% prejudgment interest calculated from July 27, 2015 through the date of judgment; $250,082.87, plus 9% prejudgment interest calculated from October 21, 2015 through the date of judgment; $248,953.52, plus 9% prejudgment interest calculated from March 28, 2016 through the date of judgment; and $326,820.33, plus 9% prejudgment interest calculated from October 31, 2016 through the date of judgment.

The Clerk of Court is directed to enter judgment in favor of Plaintiff as set forth above, to terminate all pending motions, and to close this case.

SO ORDERED.

Dated: May 15, 2018
      New York, New York

_____
GREGORY H. WOODS
United States District Judge